**Noreen P. KEMETHER**

v.

**PENNSYLVANIA INTERSCHOLASTIC ATHLETIC ASSOCIATION, INC.**

**No. CIV. A. 96–6986.**

United States District Court,
E.D. Pennsylvania.

Aug. 6, 1998.

Reconsideration Denied Sept. 3, 1998.

David F. Abernathy, Julianne L. Peck, Drinker, Biddle & Reath, Philadelphia, PA, Terry L. Fromson, Women's Law Project, Philadelphia, PA, for Plaintiff.

Jeffrey F. Champagne, Elizabeth A. Dougherty, William M. Young, Jr., McNees, Wallace & Nurick, Harrisburg, PA, for Defendant.

## MEMORANDUM AND ORDER

YOHN, District Judge.

Plaintiff Noreen Kemether brings this action under Title VII and Title IX of the Civil Rights Act of 1964, based on allegations that

she suffered gender-based discrimination as a basketball official (i.e., referee), in her assignments to officiate high school interscholastic games. Defendant Pennsylvania Interscholastic Athletic Association, Inc. has filed a motion for summary judgment, and plaintiff has filed a motion for partial summary judgment. For the reasons set forth below, defendant's motion will be granted in part and denied in part, and plaintiff's motion will be denied.

## STANDARD OF REVIEW

Under Fed.R.Civ.P. 56(c), summary judgment is to be granted upon motion of any party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A factual dispute does not preclude summary judgment unless it is material; that is, unless it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Where the parties present cross-motions for summary judgment, the court must consider each party's motion separately. *Bencivenga v. Western Pa. Teamsters & Employers Pension Fund*, 763 F.2d 574, 576 n. 2 (3d Cir.1985) (citing *Rains v. Cascade Indus., Inc.*, 402 F.2d 241 (3d Cir.1968)). On each issue, "the evidence of the nonmovant is to be believed," and the court must draw all reasonable inferences in the nonmovant's favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. The nonmovant nonetheless "must present affirmative evidence to defeat a properly supported motion for summary judgment," *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505, and must do more than rest upon mere allegations, general denials, or vague statements. *Trap Rock Indus., Inc. v. Local 825*, 982 F.2d 884 (3d Cir.1992). Where the nonmovant bears the burden of persuasion at trial, the moving party may meet its burden with a showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. However, "the mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Rather, "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## BACKGROUND

The following account is based upon substantially undisputed facts, except where noted.[1]

Defendant Pennsylvania Interscholastic Athletic Association, Inc. ("PIAA") is a statewide athletic association, organized as a nonprofit membership corporation. (Def.'s App. Ex. D.) PIAA's membership comprises approximately 1,300 Pennsylvania high schools and junior high schools, both public and private. (*Id.*) PIAA's executive and administrative body is its Board of Control, which has "general control over all interscholastic athletic relations and athletic contests in which a member school of this association participates." (PIAA Const. art. VI, § 1, art. VIII, § 1(A).)

PIAA divides Pennsylvania into eleven districts, both for administrative purposes and for interscholastic competition in which district qualifiers advance to statewide championships. (*Id.* art. V, § 1; Rules and Regulations at 22–27.) Each district is administered by a district committee, elected by the member schools in that district.

---

1. In support of its motion for summary judgment, PIAA has filed twelve complete deposition transcripts. These depositions will be treated as defendant's evidence for purposes of summary judgment, except for those portions that are adopted or undisputed by plaintiff. Plaintiff's evidence includes PIAA's Constitution, By–Laws, and Rules and Regulations (Fromson Decl. Ex.

4), and two editions of PIAA's Athletic Officials' Manual (Fromson Decl. Ex. 42, 43). No portion of those documents has been disputed by defendant. Because the differences between the two Athletic Officials' Manuals are not material to this opinion, citations thereto are by section number, and are valid for both editions.

(PIAA Const. art. VIII.) Each district has at least one representative on PIAA's Board of Control. (*Id.* art. VI, § 2.) PIAA District I includes Bucks, Chester, Delaware, Montgomery, and Philadelphia counties. (*Id.* art. V, § 1.)

PIAA undertakes four major areas of responsibility: (1) establishing and enforcing eligibility rules for high school athletes, (2) organizing and operating playoffs and championships, (3) adopting playing rules for each sport, and (4) registering and training officials. (Cashman Dep. Ex. 6 at 4–5.) Pursuant to the last of these responsibilities, PIAA tests and registers officials in various sports, and charters local chapters of registered officials.

Plaintiff Noreen Kemether is a PIAA-registered basketball official. Kemether played basketball competitively in high school and college, where she was a member of a national championship women's team. She has continued to play in adult recreational leagues since college, and has coached basketball in camps, elementary schools, and high schools. Since the 1984–85 season, she has officiated basketball games at local schools and colleges that were not members of PIAA. Kemether passed PIAA's required examination, and in November 1990, she became registered with PIAA as a basketball official. She was then permitted to work in basketball games played by PIAA member schools.

Every PIAA-registered official is required to join a local chapter. One such chapter is the Delaware County Chapter of PIAA Basketball Officials ("Delco Chapter"), which Kemether joined upon registering with PIAA. Plaintiff alleges that the Delco Chapter "act[s] as PIAA's agent at the local level." (Amended Compl. ¶ 19.) Defendant contests that allegation, contending that the Delco Chapter is merely a "local group[ ] of individuals who are not members of PIAA." (PIAA Br. Mot. Summ. J. at 5.)

Officials are paid on a per-game basis by the member schools, pursuant to a standard "Contract for Officials Under P.I.A.A. Rules" approved by PIAA (see Fromson Decl. Ex. 7–9), which PIAA requires its member schools and its registered officials to use for each contest. In its constitution, PIAA asserts the power "to determine the method and the qualifications for the registration of officials; to determine their powers and duties; and to make and apply necessary penalties and forfeits for the control of such officials." (PIAA Const. art. VII, § 1(F).)

As a Delco Chapter official, plaintiff has officiated games between PIAA schools in two local leagues, one of which is the Del Val Athletic Association ("Del Val"). Del Val is an athletic league of eight high schools that regularly compete against each other. Del Val is organized as an unincorporated association, and includes seven public schools and one private school. The Del Val schools are members of PIAA, and are located in PIAA District I. (Fromson Decl. Ex. 5 at 1; Ruoff Dep. at 25–27.) During the regular basketball season, Del Val and its member schools arranged for PIAA-registered basketball officials from the Delco Chapter to officiate their interscholastic games.

An "assignor" is a person authorized and paid to select officials to officiate particular games. Harry Sheldrake was the assignor who assigned Delco Chapter basketball officials to games in the Del Val league. Sheldrake was a PIAA-registered official and a member of the Delco Chapter. In the 1996–97 season, James Faulkner succeeded Sheldrake as assignor and has continued through the current season. Del Val paid the assignors a fee for their services. (Fromson Decl. Ex. 11.) Plaintiff alleges that the Delco Chapter selected the assignors for Del Val, and that the assignors were agents of PIAA through the Delco Chapter. (Amended Compl. ¶ 27.) Defendant alleges that Delco Chapter merely recommended the assignors to Del Val, and gave them advice, but that the assignors were not controlled by the Delco Chapter. (Def.'s Mem. Opp. Summ. J. at 20.)

Despite plaintiff's request for boys' games and varsity games, Sheldrake assigned Kemether only to girls' junior varsity games during her first three seasons as a member of the Delco Chapter. (Sheldrake Dep. at 100–01, 237–44; Fromson Decl. Ex. 1.) Sheldrake and Faulkner have never assigned a

female official to boys' varsity or junior varsity games, but only to ninth grade or younger boys' games. (Sheldrake Dep. at 143, 155, 235; Faulkner Dep. at 93, 119.) In the 1993–94 and 1994–95 seasons, after Kemether's complaint to the EEOC, Sheldrake assigned Kemether to at least one girls' varsity game, and three ninth grade boys' games. (Sheldrake Dep. at 145, 245–47; Fromson Decl. Ex. 1.) In the 1995–96 season and thereafter, Sheldrake and Faulkner assigned no games to Kemether. Plaintiff alleges that the assignors' failure to assign her to any games was in retaliation for filing and pursuing her EEOC complaint. (Amended Compl. ¶¶ 53, 56, 60, 62, 64.)

Officials were assigned to post-season play-off and championship games by a different method. (See, *e.g.*, Fromson Decl. Ex. 10, 15–17, 44.) The assignor's role in directly selecting officials ends with the regular season, and does not extend to post-season district playoffs, state playoffs, and championships. PIAA does not dispute that it has general control and responsibility over championship events, including selecting officials for all post-season games. (See Rules and Regulations at 5.) On the basis of recommendations from coaches and assignors, PIAA District I selects officials for district playoffs. (Ruoff Dep. at 77, 81.) Two separate lists are maintained for officials wishing to be considered for boys' games or girls' games. (*Id.* at 63.) To be eligible, each official must have officiated ten varsity games in both the current and the previous year. (*Id.* at 63, 76.) For state playoffs, the district recommends officials using criteria that include a requirement of five years officiating in district playoffs, and working ten varsity games in the current season. (Lombardi Dep. at 151–59, 165; Cashman Dep. at 145.) To be eligible for boys' playoffs, the ten games must be boys' varsity games, and for girls' playoffs they had to be girls' varsity games. (Cashman Dep. at 145.)

Both male and female officials have officiated girls' playoff and championship games. However, no female official has ever been recommended to officiate a boys' playoff game in PIAA District I. (Lombardi Dep. at 99, 108.) No female official has ever officiated a boys' championship game at the state level. (Cashman Dep. at 145; Lombardi Dep. at 184.)

EEOC issued plaintiff a right-to-sue letter on August 20, 1996. In plaintiff's amended complaint, she asserts claims against PIAA for violations of Title VII and Title IX, the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983, and the First Amendment, as well as state law claims under Pa. Const. art. 1, § 7 (freedom of speech) and Pa. Const. art. 1, § 28 (Equal Rights Amendment). Defendant has filed a motion for summary judgment, and plaintiff has filed a motion for partial summary judgment.

## ISSUES OF AGENCY

For many of the claims in this case, defendant's liability will turn upon whether Harry Sheldrake and his successor James Faulkner, in performing their work as assignors, were acting as agents or servants of PIAA.

Much of the assignors' relevant conduct arose out of their relationship with the Delco Chapter, and not from any relationship they may have had with PIAA's Board of Control or a district committee. Therefore, the jury must necessarily decide whether the Delco Chapter stands in a relationship with PIAA such that defendant PIAA may be held liable for Delco Chapter's conduct. The jury must also decide whether the assignors were agents or servants of the Delco Chapter, which could establish that they were sub-agents or subservants of PIAA.

If the assignors were not directly or indirectly acting as agents or servants of PIAA, then PIAA is not liable for any discriminatory practices the assignors might have committed against plaintiff.

## I. RELEVANT PRINCIPLES OF COMMON–LAW AGENCY

In determining an employer's vicarious liability under Title VII, the United States Supreme Court recently emphasized that "a uniform and predictable standard must be established as a matter of federal law. We rely 'on the general common law of agency, rather than on the law of any particular

State, to give meaning to these terms.'" *Burlington Industries, Inc. v. Ellerth,* —— U.S. ——, ——, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633, —— (1998) (quoting *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 740, 109 S.Ct. 2166, 2173, 104 L.Ed.2d 811 (1989)). The Court in *Burlington* points to the Restatement (Second) of Agency (1957) (hereinafter "Restatement") as "a useful beginning point for a discussion of general agency principles," although "common-law principles may not be transferable in all their particulars to Title VII." *Id.* at 2266 (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986)).

## A. Definition of Relationships Under Agency Law

■ Where one party agrees to act on another's behalf, there are three relevant relationships that may be possible between them, based primarily upon the second party's control or right to exercise control over the actor. The actor may be: (1) a servant, (2) an agent independent contractor, or (3) a non-agent independent contractor. *AT & T v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1437–39 (3d Cir.1994). The distinction between a servant, an agent, and a non-agent is critical due to the liability implications for the hiring party.

■ The relationship between principal and agent is defined as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *General Building Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 392, 102 S.Ct. 3141, 3151, 73 L.Ed.2d 835 (1982) (quoting Restatement § 1(1)).[2]

■ The master-servant relationship is a specialized kind of principal-agent relationship. While a servant necessarily must be an agent, "a finding of agency is not tantamount to a finding of a master-servant relationship." *Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1349 (3d Cir.1991) (quoting *Kelley v. Southern Pacific Co.,* 419 U.S. 318, 325, 95 S.Ct. 472, 477, 42 L.Ed.2d 498 (1974) (citing Restatement § 2)). Rather, "[a] master-servant relationship is a form of agency in which the master employs the servant as 'an agent to perform service in his affairs' and 'controls or has the right to control the physical conduct of the other in the performance of the service.'" *General Building,* 458 U.S. at 392, 102 S.Ct. at 3151 (quoting Restatement § 2). The word "servant," used as a term of art in agency law, is generally the same as "employee in modern day parlance." *McCarthy v. Recordex Service, Inc.,* 80 F.3d 842, 853 (3d Cir.1996); see Restatement § 2 cmt. d.[3]

■ The difference between a mere agent and a servant depends "not so much on 'the fact of actual interference or exercise of control by the employer ... but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor.'" *Jones v. Century Oil U.S.A., Inc.,* 957 F.2d 84, 86–87 (3d Cir. 1992) (citations omitted). The Third Circuit has pointed out that "the determining factor is not the way in which plaintiff[ ] or defendant regards this relationship but 'what it really was under the facts and applicable rules of law.'" *Id.* "[A] master not only controls the results of the work but also may direct the manner in which such work shall be done, and a servant, in rendering the agreed services, remains entirely under the control and direction of the master." *Id.* (quoting *Smalich v. Westfall,* 440 Pa. 409, 269 A.2d 476, 481 (1970)).

*E.g., Kelley v. Southern Pacific Co.,* 419 U.S. 318, 324, 95 S.Ct. 472, 476, 42 L.Ed.2d 498 (1974) (motor carrier could be servant of railroad) (citing Restatement § 5(2)); *Moon Area School District v. Garzony,* 522 Pa. 178, 560 A.2d 1361, 1367 (1989) (parking management corporation was servant of county) (citing Restatement § 5(2)).

**2.** The Restatement urges caution in the use of this definition because "[t]he brevity of a definition necessarily makes it an incomplete and inaccurate statement." *Realco Services, Inc. v. Holt,* 513 F.Supp. 435, 443 (E.D.Pa.1980) (quoting Restatement at 7).

**3.** However, a servant need not be an individual; one company may be the servant of another.

■ An independent contractor may be an agent or a non-agent, but cannot be a servant, since "servant" and "independent contractor" are antithetical terms. *McCarthy*, 80 F.3d at 853 (citing Restatement § 2 cmt. b). Where prerequisites of agency, such as control, are not satisfied, a non-agent independent contractor relationship may exist:

> A person who contracts to accomplish something for another or to deliver something to another, but who is not acting as a fiduciary for the other is a non-agent contractor. He may be anyone who has made a contract and who is not an agent. The term is used colloquially to describe builders and others who have contracted to accomplish physical results not under the supervision of the one who has employed them to produce the results.

*Winback*, 42 F.3d at 1439 (quoting Restatement § 14N cmt. b).

## B. Liability of Master or Principal to Third Parties

■ In adapting the common law of agency to Title VII concepts, agency law relating to intentional torts, rather than negligent torts, is applied to determine an employer's liability. See *Burlington*, 118 S.Ct. at 2266 (applying Restatement § 219) ("Sexual harassment presupposes intentional conduct.") Like a sexual harassment claim, an employment discrimination claim for disparate treatment requires proof of intentional conduct. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

The distinction between an agent and a servant is critical due to the liability implications for the principal. It is a central principle of agency law that "[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment." *Burlington*, 118 S.Ct. at 2266 (quoting Restatement § 219(1)); *Jones*, 957 F.2d at 86–87. "It is because a master has the right to exercise control over the physical activities of the servant within the time of service, that he is vicariously liable [even] for the servant's negligent acts committed within the scope of his employment." *Id.* (quoting

*Smalich v. Westfall*, 440 Pa. 409, 269 A.2d 476, 481 (1970)) (internal quotations omitted). As a matter of policy, "[i]t would be unjust to permit an employer to gain from the intelligent cooperation of others without being responsible for the mistakes, the errors of judgment and the frailties of those working under his direction and for his benefit." *Winback*, 42 F.3d at 1434 (citing *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1358 (3d Cir.1987) (quoting Restatement § 219 cmt. a)).

Intentional discrimination may be within the scope of a servant's employment. The Restatement provides:

> Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master. . . .

Restatement § 228(1); see *Aliota v. Graham*, 984 F.2d 1350, 1358 (3d Cir.1993) (applying § 228 and predicting Pennsylvania would adopt same). "There are instances, of course, where a supervisor engages in unlawful discrimination with the purpose, mistaken or otherwise, to serve the employer," such as when the employer has a policy of discouraging women from seeking advancement, and the discrimination furthers that policy. *Burlington*, 118 S.Ct. at 2266 (citing *Sims v. Montgomery County Comm'n*, 766 F.Supp. 1052, 1075 (M.D.Ala.1990)).

Furthermore, "[i]n limited circumstances, agency principles impose liability on employers even where employees commit torts outside the scope of employment." *Burlington*, 118 S.Ct. at 2267 (citing Restatement § 219(2)). This may occur, inter alia, where "the master was negligent or reckless," Restatement § 219(2)(b), or where the servant "was aided in accomplishing the tort by the existence of the agency relation." *Id.* § 219(2)(d); see generally *Burlington*, 118 S.Ct. at 2268.

■ A principal generally will not be held liable for the torts of his agent who is an independent contractor, not a servant. *Winback*, 42 F.3d at 1437. However, there are

many exceptions to that general rule. The principal may be liable if the agent's tortious conduct is authorized but unintended, "[i]f the agent reasonably misunderstands the principal's meaning which is ambiguous in light of the circumstances." Restatement § 215. Even if unauthorized, a principal "is often subject to liability for the unauthorized conduct of an agent with respect to matters which, under the agreement creating the relation, he has the right to direct.... [L]iability is normally based upon the fact that the tort is brought about in the course of an undertaking for the benefit, and subject to the right, of the principal to control his servant or other agent." Restatement § 216 cmt. a.

▓▓ Where there is no agency at all, liability must be based on other theories, such as apparent authority, under which the court examines the principal's actions and the reasonable beliefs of third parties. *Id.* at 1439–40.

4. This evidence alone probably suffices to establish the Delco Chapter's separate existence as an unincorporated association. In Pennsylvania, an unincorporated association is "a body of individuals acting together for the prosecution of a common enterprise without a corporate charter but upon methods and forms used by corporations." *Selected Risks Ins. Co. v. Thompson*, 520 Pa. 130, 552 A.2d 1382, 1385 (1989) (quoting 6 Am.Jur.2d Associations and Clubs § 1). An unincorporated association "is not an entity" for state tort law purposes. See *id.* However, under federal civil rights law, an unincorporated association may be liable as an employer. See 42 U.S.C. § 2000e(b) (all employers are persons), § 2000e(a) (definition of "person" includes "associations" and "unincorporated organizations").

5. One employer has been held liable under Title VII for the allegedly discriminatory acts of another's employees or servants if the two employers constitute an "integrated enterprise." *Martin v. Safeguard Scientifics, Inc.*, No. 96–8293, 1998 WL 306528, at *4–6 (E.D.Pa. June 5, 1998) (citing *N.L.R.B. v. Browning–Ferris Indus.*, 691 F.2d 1117, 1122 (3d Cir.1982)); *Sabo v. Lifequest, Inc.*, No. 95–3757, 1996 WL 583169, at *3 (E.D.Pa. Oct.8, 1996). To determine whether an integrated enterprise exists, a court should consider these factors:

(1) Interrelation of operations, i.e. common offices, common record keeping, shared bank accounts and equipment.

## II. THE DELCO CHAPTER'S RELATIONSHIP TO PIAA

▓▓ Plaintiff does not clearly describe the relationship she seeks to establish between PIAA and Delco Chapter, sometimes referring to "PIAA's Delco Chapter" (Pl.'s Mem. Summ. J. at 10, 15; see *id.* at 7, 28), or to the chapter as PIAA's "subunit" (*id.* at 31, 34). Plaintiff's own evidence, however, shows that the Delco Chapter is organized as a distinct association with its own constitution, by-laws, and officers.[4] (Athletic Officials' Manual, §§ I D, II.) "Subunit" is therefore not the appropriate term to describe its relationship to PIAA. By characterizing Delco Chapter as PIAA's "subunit," plaintiff may be attempting to demonstrate that Delco Chapter and PIAA are so closely integrated that they should be considered a single employer.[5]

As an alternative theory, plaintiff may show that PIAA is liable for Delco Chapter's conduct because of a master-servant or principal-agent relationship between the two.

(2) Common management, common directors and boards.

(3) Centralized control of labor relations.

(4) Common ownership and financial control. *Stair v. Lehigh Valley Carpenters Local Union No. 600*, No. 91–1507, 1993 WL 235491, at *22 (E.D.Pa. July 24, 1993) (quotation omitted), *aff'd*, 43 F.3d 1463 (3d Cir.1994); accord *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 994 (6th Cir.1997); *Trevino v. Celanese Corp.*, 701 F.2d 397, 403–04 (5th Cir.1983); *Browning–Ferris*, 691 F.2d at 1122; *Baker v. Stuart Broadcasting Co.*, 560 F.2d 389, 392 (8th Cir.1977). None of these factors is conclusive, and all four need not be met in every case, but control over labor relations is a central concern. *Swallows*, 128 F.3d at 994. Plaintiff has provided no evidence tending to establish the first two factors. Such evidence as the PIAA-drafted contract mandated for use between officials and schools may support a finding of centralized control of labor relations with officials. As to the factor of common ownership and financial control, "[i]f neither of the entities is a sham then the fourth test is not met." *EEOC v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566, 572 (6th Cir. 1984). Plaintiff has not raised this theory, and it is obviously highly doubtful that she could successfully establish that the distinction between the officials' chapters and PIAA is artificial, and that Delco Chapter is a sham organization created by PIAA to avoid application of certain laws, while remaining under the full control of PIAA. See *Rogers v. Sugar Tree Products, Inc.*, 7 F.3d 577, 582 (7th Cir.1993).

Defendant PIAA, arguing against such a relationship, characterizes the chapters as "local groups of individuals who are not members of PIAA." (PIAA Br. Mot. Summ. J. at 5). Chapters are formed and managed by PIAA-registered officials, and not by PIAA or its member schools. (Athletic Officials' Manual § I D.) Defendant asserts as a fact that PIAA has no role in the selection of officials during the regular season. (PIAA Mem. Opp. Summ. J. at 19.) Defendant argues that it could not have delegated the task of selecting officials to the Delco Chapter as a principal delegating a task to an agent, because defendant had no such task to delegate. (*Id.*)

Plaintiff provides evidence supporting an inference that each chapter is comprehensively regulated and controlled by PIAA from its inception. In order to be chartered by PIAA, each chapter must adopt a PIAA-approved constitution without modification. (*Id.* §§ I D 5, II.) This document, titled "Constitution and By-Laws of the Pennsylvania Interscholastic Athletic Association, Inc. Chapters of Registered Athletic Officials," was revised by the PIAA Board of Control in 1986. (Athletic Officials' Manual § II, hereinafter "PIAA Chapter Const.") This required constitution provides that whenever PIAA adopts new rules, they become binding upon all chapters in the following season. (PIAA Chapter Const. art. VI.) PIAA may revoke a charter for failure to follow PIAA rules. (PIAA Const. art. III.) A regulation imposed by PIAA requires each registered official to join a PIAA-chartered local chapter of registered officials, such as the Delco Chapter, and to attend meetings of that chapter. (Athletic Officials' Manual § I C 1.) Each member and officer of a chapter must be a PIAA-registered official. (PIAA Chapter Const. arts. IV, VII.) Members of each chapter are required to pay dues directly to PIAA. (PIAA Chapter Const. art. V, § 2.) A chapter must formally report its membership and meeting dates to PIAA annually. (PIAA Chapter Const. art. X.) Given these facts, plaintiff urges that PIAA has the authority to control the Delco Chapter, and in fact exercised that power to control assignments of officials through the Delco Chapter. (Fromson Decl. Opp. Summ. J. Ex. 1.)

■ The party asserting the existence of an agency relationship bears the burden of showing it. *Mahon v. City of Bethlehem*, 898 F.Supp. 310, 312 (E.D.Pa.1995) (citing *Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co.*, 412 Pa.Super. 140, 602 A.2d 1348, 1351 (1992)). Because the facts relating to PIAA's right to exercise control over the Delco Chapter are disputed, the question of agency will be for the jury to decide. *Woolfolk v. Duncan*, 872 F.Supp. 1381, 1392 (E.D.Pa. 1995). Both motions for summary judgment will be denied as to whether PIAA may be held liable for the Delco Chapter's conduct.

## III. THE ASSIGNORS' RELATIONSHIP TO PIAA AND THE DELCO CHAPTER

■ It will be necessary to determine whether PIAA is liable for the acts of Sheldrake or Faulkner under the general common law of agency. *Burlington*, 118 S.Ct. at 2265. Unless the facts are undisputed, whether a person is a servant or an independent contractor for liability purposes is a jury question. See *Woolfolk*, 872 F.Supp. at 1392 (citing *Feller v. New Amsterdam Cas. Co.*, 363 Pa. 483, 70 A.2d 299, 300–301 (1950)). Plaintiff, as the party asserting the existence of an agency relationship, bears the burden of demonstrating that relationship. See *Mahon*, 898 F.Supp. at 312.

■ Plaintiff has produced little evidence tending to show the existence of a direct principal-agent or master-servant relationship between the assignors and PIAA.[6]

---

6. Under certain limited circumstances, PIAA's District Chairman and Executive Director have a duty to assign regular season games, which suggests that they may circumvent or override the decision of an assignor. (PIAA By-Laws art. XI, § 8.) But cf. *General Building*, 458 U.S. at 393, 102 S.Ct. 3141 ("the 'power to oppose' ... is not tantamount to a 'right to control'"). Plaintiff also suggests that PIAA's selection process for officials in the post-season "perpetuated and incorporated by reference" the discriminatory conduct of the regular season assignors. (Pl.'s Mem. Opp. Summ. J. PIAA at 2–3.) Under some circumstances, this might constitute ratification of the actions of the assignors. There exists actual authority to act as an agent if the putative agent

However, if the Delco Chapter is found to be a servant or agent of PIAA, the jury must also consider whether the assignors were servants or agents of the Delco Chapter, which would create a chain linking the assignors to defendant PIAA as subservants or subagents. Such a situation is contemplated in the general common law of agency. The Restatement defines a subservant as

> a person appointed by a servant empowered to do so, to perform functions undertaken by the servant for the master and subject to the control as to his physical conduct both by the master and by the servant, but for whose conduct the servant agrees with the principal to be primarily responsible.

Restatement § 5(2). The subservant relation exists where "the servant is to direct the conduct of the subservant who is to be subject also to the superior power of control which the master may exercise." *Id.* cmt. e.[7] In other words, the principal may be vicariously liable under Restatement § 219 for the conduct of an employee, servant, or subservant acting within the scope of his employment, but is not generally liable for the conduct of an independent contractor or nonservant who is merely an agent or subagent acting within the scope of his agency. See Restatement §§ 5, 219 & cmt. b.

The subservant relationship may be established where the putative employee is "a subservant of a company that was in turn a servant of the [defendant]." *Kelley v. Southern Pacific Co.,* 419 U.S. 318, 324, 95 S.Ct. 472, 476, 42 L.Ed.2d 498 (1974) (applying common-law agency principles under FELA) (citing Restatement § 5(2)). Section 220 of the Restatement defines who is a servant, and although it is "directed primarily at determining whether a particular bilateral arrangement is properly characterized as a master-servant or independent contractor relationship, ... [it] can also be instructive in analyzing the three-party relationship between two employers and a worker." *Id.* (citing Restatement § 220(2)).

■ For liability purposes, a subagent is treated as an agent, and a subservant is treated as a servant. To establish the liability of defendant PIAA under the subservant theory, plaintiff must show both that Delco Chapter was the servant of PIAA, and that the individual assignors were employees or servants of Delco Chapter. If Delco Chapter is an agent but not a servant of PIAA, or if an assignor is an agent but not a servant of Delco Chapter, the assignor is a subagent of PIAA.[8]

acts consistently with a manifestation of the principal's consent to an agency relationship. *IRS v. Gaster,* 42 F.3d 787, 793 (3d Cir.1994). Retroactive consent exists where a principal ratifies acts done on its behalf after the fact. *Id.* (citing Restatement § 100 & cmt. a). The concept of ratification provides that "a principal may be bound by an agent's unauthorized prior act if the principal knows about it and fails to take affirmative steps to disavow the act." *United States v. One 1973 Rolls Royce,* 43 F.3d 794, 818 n. 26 (3d Cir.1994) (citing Restatement § 83). Here, the parallel argument would be that during postseason competition, PIAA knew of, used, and benefited from discriminatory employment decisions made by the assignors in the regular season. See Restatement §§ 98–99 (receipt or retention of benefits as affirmance). While the ratification doctrine might support a finding of agency on that basis, "even in agency law the concept of ratification requires a special relationship." *Rolls Royce,* 43 F.3d at 818 n. 26. A requisite for ratification is that "the one acting purported to be acting for the ratifier," or "intends or purports to perform [a service] as the servant of another." *Restatement* § 85. While the assignors might have acted on Delco Chap-

ter's behalf, plaintiff has offered no evidence that the assignors intended or purported to act on PIAA's behalf in assigning officials.

7. As one example, the Restatement offers "the employees of a branch manager of a corporation where the branch manager is free to control and pay his assistants, but where all are subject to control by the corporation as to their conduct." *Id.* cmt. e. The subservant's employer and the employer's master are both subject to liability for the subservant's torts committed within the scope of his employment. *Id.* cmt. f.

8. If Delco Chapter were found to be an agent, but not a servant, of PIAA, plaintiff cannot establish that an assignor is a subservant of PIAA, even if the assignor is a servant or employee of Delco Chapter. This situation is described in an illustration in the Restatement: "P employs A, a real estate broker, to sell Blackacre. A employs salesmen to show the premises to prospective customers and to indicate the terms of sale. The salesmen are servants of A but not of P, although they are subagents of P." Restatement § 5, illus. 5; *see Moss v. Ole South Real Estate, Inc.,* 933 F.2d 1300, 1312 (5th Cir.1991).

The distinction between a servant and an agent independent contractor depends primarily upon the right of control capable of being exercised by the principal; servants "generally are employees of the principal, and are subject to physical control by the principal." *Winback,* 42 F.3d at 1434–35. "Persons who render service but retain control over the manner of doing it are not servants." *Id.* at 1435 (quotation omitted). An agent who is subject only to "general control and direction by the principal" is not a servant but an agent independent contractor. *Id.* (quotation omitted).

Portions of the deposition evidence offered by defendant would be sufficient to support a finding that the Delco Chapter had the right or authority to control or interfere with an assignor's performance of his work; for example, by establishing a system for evaluating officials and requiring an assignor to base his decisions upon those evaluations. According to James Faulkner, the Delco Chapter's evaluation committee gave recommendations to the assignor, which were followed. (Faulkner Dep. at 66–68.) Harry Sheldrake testified that he was given the assignor's job by the executive committee of the Delco Chapter (Sheldrake Dep. at 27), and that he understood himself to be assignor "for the chapter" from 1984 until 1994 or 1995. (*Id.* at 22–23.) As assignor, Sheldrake attended the chapter's committee meetings, although he was not a member of any committee. (*Id.* at 35.) Sheldrake further testified that in 1995, due to plaintiff's complaint of discrimination, the Delco Chapter "felt like they didn't want to be involved," and said "You're on your own," which would support an inference that he had not previously been acting on his own. (*Id.* at 31–32.)

Other portions of Sheldrake's deposition, however, would support a finding that an assignor acts independently of the Delco Chapter. Sheldrake testified that "an assignor, to begin with, he can do what he wants, period." (*Id.* at 37.) Asked if he had ever received "any instructions from anyone as to what to do as the assignor," Sheldrake responded, "No, I'm my own boss." (*Id.* at 51.) He stated, "I was assigned by the Del Val league to assign their schools. . . . It has

nothing to do with the [Delco Chapter] officials." (*Id.* at 38.) Sheldrake was compensated by the Del Val league. (*Id.* at 62.) Finally, when Sheldrake decided to retire from his position as assignor, he communicated that decision to an official of the Del Val league, rather than the Delco Chapter, and recommended his own successor. (*Id.* at 46–48; Forjohn Dep. at 22.) The Del Val league made the final decision that Faulkner would be the next assignor. (*Id.*)

Because the record indicates that there are disputed material facts regarding whether an assignor is an agent or servant of the Delco Chapter, summary judgment is not appropriate on the issue of agency. Therefore, for purposes of evaluating the cross-motions for summary judgment, I will assume without deciding that all questions of agency will be resolved in favor of the non-movant.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I will address plaintiff's motion for partial summary judgment first. Plaintiff does not seek summary judgment based upon on her allegations of disparity in the quality or quantity of games to which female officials were assigned. (Pl.'s Mem. Summ. J. at 2 n. 1.) Plaintiff also excludes her allegations of retaliation from this motion; therefore, her claims under the First Amendment and the Pennsylvania Constitution art. 1, § 7, will not be considered at this time. (*Id.*)

Central to each of plaintiff's remaining claims is her allegation that defendant "adopt[ed] and enforc[ed] gender-based assignment policies and practices which deprive qualified female officials of the opportunity to officiate boys' basketball games." (Amended Compl. ¶¶ 55, 58, 62, 64.) Because there are disputed material facts relating to this central proposition, plaintiff's motion for summary judgment must be denied on each claim.

For purposes of evaluating plaintiff's motion for partial summary judgment, I must accept all of PIAA's evidence as true, and give PIAA the benefit of all favorable inferences therefrom. In so doing, I recognize that there are disputed material facts that preclude a finding that either an assignor or

the Delco Chapter is an agent of PIAA as a matter of law.

## I. TITLE VII

Plaintiff has not argued a disparate impact theory with respect to this case, and has instead characterized her Title VII claim as a disparate treatment action. (Pl.'s Mem. Summ. J. at 19.) Proof of discriminatory intent is necessary to state a disparate treatment claim. *International Bhd. of Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. To establish such proof under Title VII, the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies here: "Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the [employment decision]. If the defendant articulates such a reason, the plaintiff then must prove that the facially legitimate reason was a pretext for a discriminatory motive." *In re Carnegie Center Assocs.,* 129 F.3d 290, 295 (3d Cir.1997) (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)).

The parties dispute whether the alleged disparate treatment in this case is facial discrimination or pretextual discrimination. See *Healey v. Southwood Psychiatric Hosp.,* 78 F.3d 128, 131–32 (3d Cir.1996). Plaintiff asserts that a system of overt and facial discrimination is established by a gender-based assignment process, relieving plaintiff of the burden of establishing a prima facie case. Defendant admits to no such system of classifying officials by gender in assignments. There is, however, no dispute that boys' and girls' games are openly classified by the gender of the athletes, and that separate lists are maintained of officials selected for boys' and girls' playoff games. (Ruoff Dep. at 99.) I need not determine whether overt gender classifications involving boys' and girls' games would suffice to establish a facially discriminatory employment policy regarding gender-based assignment of officials to those games because plaintiff has, as a matter of law, met the burden of establishing a prima facie case.

To establish a prima facie case, a plaintiff must show that she is a member of a protected class, that she was qualified for her position, and that an adverse decision occurred "under conditions that give rise to an inference of unlawful discrimination." *Geraci v. Moody–Tottrup, Int'l, Inc.,* 82 F.3d 578, 580 (3d Cir.1996) (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093).

Plaintiff has made out a prima facie case of intentional discrimination. It is undisputed that Noreen Kemether is a woman who has met PIAA's requirements to become registered as a basketball official, and who is therefore qualified—at least meeting "the threshold paper qualification," as defendant demurs—to officiate interscholastic basketball games. (Def.'s Mem. Opp. Summ. J. at 12.)

Based upon the deposition testimony in the record, there is substantial evidence giving rise to an inference of unlawful discrimination in the assignment process during the regular season. The assignors' testimony reflected an apparently stereotypic view of women's capabilities. Faulkner opined that "very few [women officials] can keep up with the pace with the boys' games as far as running up and down the floor and positioning. Just they were not educated at the boys' level so they really don't know how quick it's going to be compared to doing a girls' varsity game." (Faulkner Dep. at 116–17.) Sheldrake was also willing to generalize about the capabilities of male and female officials:

Q: Are all the male officials in the chapter faster than the female officials in the chapter?

A: Maybe not all of them. It all depends on what category you're talking about. I'd say yes.

Q: Yes?

A: Period.

(Sheldrake Dep. at 177–78.) Consistently with the foregoing generalization, Sheldrake testified that on the occasions when he himself officiated games between 1990 and 1996, he moved "faster than every girl [official] that was in there, period," despite disabling arthritis since 1984, and "[a]t my age even,"

having been retired since 1986. (*Id.* at 12–13, 176–77).

The assignors' expressed sentiments were consistent with the assignment procedures actually implemented. In 1991 or 1992, the Delco Chapter's Evaluation Committee published a "Referee Evaluation List," which identified officials qualified for boys' varsity or junior varsity games, ranking them by categories. (Fromson Decl. Ex. 2; Scanlan Dep. at 22–24.) This list included 99 men and no women, and included a notation, "If your name doesn't appear in the above catagories [sic] your rating is JUNIOR HIGH or you are working girls['] varsity/jv." (Fromson Decl. Ex. 2.) Although the Evaluation Committee ceased to operate, partly in response to Kemether's EEOC complaint (Sheldrake Dep. at 104–05), the assignors continued to use and maintain this list, and assigned only male officials to boys' varsity and junior varsity games. (Sheldrake Dep. at 28–29, 54, 61, 105, 131, 143; Scanlan Dep. at 34–35.) There was no list of officials approved for girls' varsity games. (Sheldrake Dep. at 135.)

There is also some evidence of discrimination during post-season games. PIAA District I and PIAA's Board of Control selected no women to officiate boys' playoff or championship games. Plaintiff's evidence regarding the process by which recommendations are made supports an inference that the alleged discrimination during the regular season is incorporated into PIAA's selection process, despite the use of facially neutral criteria. While it remains disputed whether the assignors and the Delco Chapter are agents of PIAA, it is clear that the total absence of any female officials from the boys' playoff list gave PIAA and its district committee grounds from which it could have inferred that an official's gender may have been taken into account improperly by the Delco Chapter, its Evaluation Committee, or the assignors. Plaintiff points out that these signs may have been ignored by PIAA due to long-standing gender stereotypes, evidenced by a District I officer's statement that "what you are dealing with is just a tradition of men working boys' games." (Ruoff Dep. at 126.)

PIAA has articulated a number of non-discriminatory reasons why Kemether was not assigned to officiate the games she desired. Among them, PIAA suggests that plaintiff's varsity game assignments in the years prior to her EEOC complaint were consistent with those of other newcomers to the Delco Chapter. (Sheldrake Dep. at 29, 229, 235.) PIAA suggests that plaintiff is typical of many officials, regardless of gender, who complain that they are not rated as highly as they deserve. (Faulkner Dep. at 77.) PIAA has also proffered reasons that are more personal to Kemether, and not invidiously discriminatory in nature; for instance, the observation that plaintiff declined to attend scrimmages at which her skills could have been evaluated (Wisniewski Dep. at 56; Sheldrake Dep. at 223–24), and the assignor's belief that plaintiff had improperly changed a contract and missed a game to which she was assigned (Sheldrake Dep. at 247–55). In addition, individuals who watched plaintiff officiate observed that she was "lackadaisical" (Watkins Dep. at 47–49; Wisniewski Dep. at 59–60), "did not hustle" (*id.* at 59–60), was lacking in the requisite skills (*id.* at 72, 86), or was simply not as good an official as some other women and men (Stephens Dep. at 101, 107).

Since PIAA has proffered legitimate non-discriminatory reasons, "the presumption of discrimination arising from the prima facie case drops away, leaving the burden on [plaintiff] to prove that [defendant]'s proffered reasons were pretextual." *Geraci,* 82 F.3d at 580. In addition to proving pretext, the plaintiff must prove by a preponderance of the evidence that she was intentionally discriminated against on the basis of gender. "Proof of one without the other will not suffice." *Seman v. Coplay Cement Co.,* 26 F.3d 428, 438 & n. 13 (3d Cir.1994) (citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511 & n. 4, 113 S.Ct. 2742, 2749 & n. 4, 125 L.Ed.2d 407 (1993)).

Plaintiff has not rebutted defendant's proffered reasons with specificity, and has not shown an absence of evidence supporting each of them. On plaintiff's motion for summary judgment, the court must believe the evidence of the defendant, and must draw all

reasonable inferences in the defendant's favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. I conclude that the facts remain disputed as to whether any or all of defendant's reasons were pretextual, and as to whether any discrimination against plaintiff on account of her gender in fact occurred. For this reason, summary judgment will be denied to plaintiff on her claims under Title VII.

## II. TITLE IX

The Title VII standard for proving discriminatory treatment will also be applied to plaintiff's claim under Title IX. The burden-shifting framework of *McDonnell Douglas* is particularly appropriate in a Title IX case where a plaintiff alleges that intentional sex discrimination motivated an employment decision, and the defendant advances a nondiscriminatory reason to justify the decision. See, *e.g., Yusuf v. Vassar College,* 35 F.3d 709 (2d Cir.1994); *Preston v. Commonwealth of Virginia ex rel. New River Community College,* 31 F.3d 203 (4th Cir.1994); *Roberts v. Colorado State Bd. of Agric.,* 998 F.2d 824 (10th Cir.1993); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 897 (1st Cir. 1988); *Hankins v. Temple Univ.,* 829 F.2d 437, 440–41 (3d Cir.1987) (using *McDonnell Douglas* analysis under Titles VI and VII). The *McDonnell Douglas* method of indirect proof is justified both within and outside the Title VII context because direct evidence of discriminatory motive is usually difficult to obtain, see *Hankins,* 829 F.2d at 440, and this method is well-suited to determining a defendant's true motives in cases where the defendant has disavowed any reliance on discriminatory reasons for its actions. See, *e.g., Lipsett,* 864 F.2d at 899. Because there are disputed material facts regarding whether actual discriminatory treatment took place under the Title VII standard discussed above, plaintiff's summary judgment motion must also be denied on her claims under Title IX.

## III. PENNSYLVANIA EQUAL RIGHTS AMENDMENT

The Pennsylvania Equal Rights Amendment ("ERA") reads as follows:

"Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual." Pa. Const. art. 1, § 28. There is a private right of action for cases of gender discrimination under the Pennsylvania ERA. *Pfeiffer v. Marion Center Area School District,* 917 F.2d 779, 789 (3d Cir.1990) (citing *Bartholomew v. Foster,* 115 Pa.Cmwlth. 430, 541 A.2d 393 (1988), *aff'd,* 522 Pa. 489, 563 A.2d 1390 (1989)).

In *Commonwealth ex rel. Packel v. Pennsylvania Interscholastic Athletic Ass'n,* 18 Pa.Cmwlth. 45, 334 A.2d 839 (1975), the Commonwealth Court determined that PIAA is a state actor, and is subject to the scrutiny imposed by the ERA. 334 A.2d at 842 (citing *Harrisburg School District v. Pennsylvania Interscholastic Athletic Ass'n,* 453 Pa. 495, 309 A.2d 353 (1973)). The court held that a PIAA by-law barring girls from participating in interscholastic sports with boys violated the Pennsylvania ERA because the provision embodied the stereotype that girls are generally weaker and boys generally more skilled at athletics. *Id.* at 842–43.

In its most recent case construing Pennsylvania's ERA, the Third Circuit cited *Packel* with approval. *Williams v. School District of Bethlehem,* 998 F.2d 168, 177 (3d Cir.1993) (citing *Packel,* 334 A.2d at 843). The *Williams* court held that the ERA is violated if a gender-based classification "in connection with team sports is based on impermissible assumptions and stereotypes about the [genders'] comparative characteristics or abilities," unless the differential treatment is "reasonably and genuinely based on physical characteristics unique to one sex." *Id.* (quoting *Fischer v. Department of Public Welfare,* 509 Pa. 293, 502 A.2d 114 (1985)).

In the absence of a clear ruling from the Supreme Court of Pennsylvania on the appropriate level of scrutiny to be applied to ERA claims, the Third Circuit has concluded that "it is the better course to use the standard more favorable to the plaintiff under the state E.R.A. in light of the strong state policy to equalize opportunities for the sexes." *Williams,* 998 F.2d at 179. The test to be applied is "whether the [challenged] rule bears a necessary relationship to a 'compel-

ling state interest.'" *Id.* (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985)).

Plaintiff's motion for summary judgment will be denied on this claim under the Pennsylvania ERA because, as discussed above, the material facts relating to discriminatory treatment are disputed as to both the regular season and the post-season. In addition, at least in so far as Sheldrake claimed, there is a material dispute of fact as to whether assignment policies during the regular season were based on actual and relevant physical differences between male and female officials. See *Williams,* 998 F.2d at 179 (remanding for factfinding as to existence of "real physical differences" warranting different treatment); *Fischer,* 502 A.2d at 125. If the assignors' policies are not justified by any such finding, a further material dispute remains as to whether the assignors were agents of PIAA such that the defendant may be held liable for the assignors' conduct.

## IV. EQUAL PROTECTION CLAIM UNDER 42 U.S.C. § 1983

 As a threshold determination before I may consider the merits of plaintiff's equal protection argument, I will address defendant's point that under the Third Circuit's controlling decision in *Williams v. School District of Bethlehem,* plaintiff's constitutional claims pursued through § 1983 are subsumed within her Title IX claim, and must be precluded. 998 F.2d at 176. Plaintiff has urged this court to disregard the Third Circuit's unequivocal adoption of the preclusion doctrine in the context of Title IX claims. (Pl.'s Mem. Opp. Summ. J. PIAA at 20–22.)

 In *Williams,* parents challenged a school district's exclusion of their son from a girls' field hockey team under Title IX and under the due process and equal protection clauses of the Fourteenth Amendment. 998 F.2d at 170. The Third Circuit noted that "where a federal statute provides its own comprehensive enforcement scheme, Congress intended to foreclose a right of action under section 1983." *Id.* at 176 (citing *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 20–21, 101 S.Ct. 2615, 2626–27, 69 L.Ed.2d 435 (1981)). In its holding, the court specifically endorsed "the applicability of the *Sea Clammers* doctrine to cases in which plaintiff asserts a claim under title IX and the federal Constitution," *id.,* upholding its 1990 decision in *Pfeiffer.* Under both *Williams* and *Pfeiffer,* it is clear that constitutional claims are indeed "subsumed" in Title IX, and that a district court, having addressed a Title IX claim, properly must refuse to hear a claim under 42 U.S.C § 1983. *Williams,* 998 F.2d at 176 (quoting *Pfeiffer,* 917 F.2d at 789).

The Third Circuit's approach recently has been vigorously approved and adopted by the Seventh Circuit. *Waid v. Merrill Area Public Schools,* 91 F.3d 857, 862–63 (7th Cir. 1996). Nonetheless, plaintiff urges this court to consider several decisions of other circuits that have reached a contrary conclusion. *Crawford v. Davis,* 109 F.3d 1281, 1283 (8th Cir.1997); *Seamons v. Snow,* 84 F.3d 1226, 1233 (10th Cir.1996); *Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 723 (6th Cir. 1996). Although the reasoning of those courts is not without force, I am, of course, bound by the clear mandate of *Williams* and *Pfeiffer.* A single set of facts cannot lead to causes of action under both Title IX and § 1983 in this circuit. *Pfeiffer,* 917 F.2d at 789. Because plaintiff's Title IX claim survives both motions for summary judgment, this constitutional claim is subsumed therein. I will therefore deny plaintiff's motion for summary judgment on her Fourteenth Amendment claim brought under § 1983.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In considering PIAA's motion for summary judgment, I will accept plaintiff's evidence as true, giving her as the non-moving party the benefit of all favorable inferences. For purposes of this motion, I will assume that agency issues are resolved in the non-movant's favor, making PIAA liable for the acts of both the Delco Chapter and the assignors.

## I. TITLE VII

In Count I of her amended complaint, plaintiff alleges that PIAA discriminated

against her on the basis of sex in violation of Title VII. She argues that PIAA is an employer for purposes of Title VII liability, and that the matchmaking role of the assignors also makes PIAA liable under Title VII as an employment agency. PIAA counters that basketball officials are independent contractors, not employees of PIAA or its member schools, and that plaintiff was not subjected to any discriminatory employment practice as defined under Title VII.

In evaluating the Title VII claims, I will first examine whether an employment relationship might exist between Kemether and PIAA. Next, I will consider whether PIAA might be liable based upon its control of Kemether's access to employment with a third party, or as an employment agency. Finally, I will consider whether PIAA falls within the statutory requirements for jurisdiction as a Title VII employer.

## A. Standard for Determining Employment Relationship

The Supreme Court recently confirmed in *Walters v. Metropolitan Educational Enterprises, Inc.,* 519 U.S. 202, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997), that the appropriate standard for determining whether an employment relationship exists for Title VII purposes is the test enunciated in *Nationwide Mutual Insurance Co. v. Darden,* 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). *Walters,* 117 S.Ct. at 666. *Darden* mandates the use of common-law principles of agency, summarized in thirteen specific factors to be considered:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring

and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. 503 U.S. at 323–24, 112 S.Ct. at 1348–49 (quoting *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 751–52, 109 S.Ct. 2166, 2178–79, 104 L.Ed.2d 811). This test examines the totality of the circumstances in determining who is an employee, with no single factor being decisive. *Id.*

The facts relating to agency relationships among PIAA, Delco Chapter, and the assignors are disputed. However, many of the facts defining the incidents of plaintiff's relationships with PIAA, Delco Chapter, Sheldrake, and Faulkner are not materially in dispute. "While their significance to whether an employment relationship or an independent contractor relationship was created is vigorously debated, resolution of that debate is a question of law." *Cilecek v. Inova Health System Services,* 115 F.3d 256, 261 (4th Cir.1997) (citation omitted).

## B. PIAA's Employment Relationship with Kemether

The potential employment relationship between Kemether and PIAA must be considered in two distinct parts: employment for regular season games, and employment for post-season games. During post-season playoff and championship events, a quite different array of material facts comes into play. For example, plaintiff has officiated regular season games at PIAA member schools, but has never been selected by PIAA to officiate a post-season game. PIAA does not dispute its comprehensive control over post-season games, including the selection and compensation of officials. Each of these factors is vigorously disputed with respect to the regular season.

### 1. *PIAA as Plaintiff's Employer During the Regular Season*

The factors enumerated in *Darden* consistently refer to a "hiring party" and a "hired party," and distinguish an independent contractor from an employee. 112 S.Ct. at 1348. Before attempting to apply the

*Darden* analysis to the regular season, I must consider the antecedent question of whether plaintiff is even a "hired party" of PIAA or its alleged agents in the first instance. *O'Connor v. Davis,* 126 F.3d 112, 115 (2d Cir.1997). This "crucial and elementary initial inquiry—whether there exists an employment relationship, according to the ordinary meaning of the words" is obligatory before "jumping straight into verbal manipulation of the case law tests for an employment relationship." *Graves v. Women's Professional Rodeo Ass'n,* 907 F.2d 71, 73 (8th Cir.1990). A plaintiff who was not hired in the first instance, and is therefore neither an independent contractor nor an employee, falls outside "the conventional master-servant relationship as understood by the common-law agency doctrine." *O'Connor,* 126 F.3d at 115 (quoting *Darden,* 503 U.S. at 322–23, 112 S.Ct. at 1348). *Darden*'s common-law agency analysis is not applicable to such a case. *Id.; Graves,* 907 F.2d at 73.

In *Graves,* a rodeo competitor brought a Title VII claim against a nonprofit corporation which sanctioned rodeo events and asserted "pervasive control" over its members by binding them to "a comprehensive set of rules and regulations" as contestants. 708 F.Supp. 233, 237 (W.D.Ark.1989), *aff'd,* 907 F.2d 71 (8th Cir.1990). The Eighth Circuit reviewed the dictionary definitions of "employer" and "employee," pointing out:

> Central to the meaning of these words is the idea of compensation in exchange for services: an employer is someone who pays, directly or indirectly, wages or a salary or other compensation to the person who provides services—that person being the employee. Compensation by the putative employer to the putative employee in exchange for his services is not a sufficient condition, but it is an essential condition to

the existence of an employer-employee relationship.

907 F.2d at 73; *cf. Walters,* 117 S.Ct. at 664 (reviewing dictionary definitions of "have," in deciding when an employer "has" an employee for Title VII purposes).

In a recent decision, the Second Circuit considered a claim brought under Titles VII and IX. In *O'Connor v. Davis,* a college student performed work for a hospital as part of an educational internship, for which she received payment from her college in the form of federal work-study funds. 126 F.3d at 113. Applying *Graves,* the court held that the hospital was not plaintiff's employer under Title VII because of "the absence of either direct or indirect remuneration or the promise thereof" from the hospital, and held that "the preliminary question of remuneration is dispositive," making consideration of the *Darden* factors irrelevant. *Id.* at 115–16.

There is no evidence of anything of value received by plaintiff from PIAA, directly or indirectly, other than liability insurance [9] and a patch worn as part of the uniform. One patch is provided free of charge when an official registers with PIAA, and additional patches must be purchased for $2.00 each. (Athletic Officials' Manual § I E 1(c).) The evidence of record cannot support an inference that either insurance or the patch is provided as indirect remuneration for services, because nothing indicates that a person must officiate any games or perform any other service in order to receive them. Rather, undisputed testimony indicates that insurance is provided to every registered official as "part of their dues." (Lombardi Dep. at 64.) PIAA charges dues of $25 per year, and "use[s] part of that money to buy the insurance." [10] (*Id.*)

---

9. The insurance provided by PIAA is described as liability insurance in evidence offered by both parties. (Lombardi Dep. at 64; Wisniewski Dep. at 25; Watkins Dep. at 68–69.) Plaintiff's deposition testimony refers once to "disability insurance through PIAA." (Kemether Dep. at 151.) There is no other mention of disability insurance in the extensive record. Because "disability insurance" appears only in the unedited transcript filed by defendant, and was not specifically adopted by plaintiff in her briefs, I will assume that the plaintiff as deponent was actually refer-

ring to the liability insurance she documents in her evidence.

10. The absence of evidence that an official renders services to PIAA in return for benefits distinguishes this case from *Haavistola v. Community Fire Co.,* 6 F.3d 211, 221–22 (4th Cir.1993). In *Haavistola,* the issue was whether insurance and other benefits were "indirect but significant remuneration [for plaintiff's services] ... or inconsequential incidents of an otherwise gratuitous relationship." *Id.* at 222. On remand, a jury

To the extent that access to employment with PIAA member schools may be considered a benefit of an official's relationship with PIAA, I note that "even benefits that create career opportunities are not always compensation." *Neff v. Civil Air Patrol,* 916 F.Supp. 710, 712 (S.D.Ohio 1996) (citing *Graves,* 907 F.2d at 72). Where, as here, the putative employer requires no actual service in return for the benefit, there can be no "compensation."

For the proposition that control over employment suffices even in the absence of a conventional employment relationship, plaintiff cites *Graves v. Lowery,* 117 F.3d 723 (3d Cir.1997), *Sibley Memorial Hosp. v. Wilson,* 488 F.2d 1338, 1342 (D.C.Cir.1973), *Poff v. Prudential Ins. Co.,* 882 F.Supp. 1534 (E.D.Pa.1995), and *Burkey v. Marshall County Board of Educ.,* 513 F.Supp. 1084 (N.D.W.Va.1981). Because *Sibley* and *Burkey* are premised upon control of access to employment, rather than control over employment, they will be discussed in a separate section of this opinion. In *Graves v. Lowery,* the Third Circuit held that Dauphin County could be a co-employer of state court clerks, where the county allegedly hired clerks for the court and "exercised the requisite control over [their] daily employment activities" through its funding, actions, and policies. 117 F.3d at 728. In *Poff,* a third party contractor actually hired the plaintiff, who worked at defendant's site for six years. 882 F.Supp. at 1535. The *Poff* court turned to *Darden*'s common law agency test, and found genuine issues of fact as to defendant's control over the manner and means by which the work was accomplished. *Id.* at 1536. Notably present in those cases, in addition to

significant control, is direct or indirect remuneration by the defendant.

There is no evidence on the record that PIAA, Delco Chapter, Sheldrake, or Faulkner ever directly or indirectly paid compensation to officials for services during the regular season, or made any promise to do so. (See Kemether Dep. at 146–47.) Rather, the evidence shows that an official's compensation for regular season games is paid by the school for which she officiates a game. (*Id.*)

This preliminary question of remuneration is dispositive of the issue of plaintiff's employment, and renders inapplicable the *Darden* factors relating to a "hiring party" or "hired party." *O'Connor,* 126 F.3d at 115–16; see also *Smith v. Berks Community Television,* 657 F.Supp. 794, 796 (E.D.Pa. 1987). The relationship between PIAA and its registered officials "categorically resists classification as 'employment' according to the ordinary usage of that term." *Graves v. WPRA,* 907 F.2d at 72–73. I conclude that no rational finder of fact could determine that defendant was plaintiff's employer during the regular season,[11] and I will grant PIAA's motion for summary judgment to that extent. As a consequence of this determination, jurisdiction over PIAA as an employer under Title VII cannot be premised upon considering officials as PIAA's employees during the regular season.

### 2. *PIAA as Employer of Officials During the Post–Season*

▆▆▆ Because officials in the post-season receive direct remuneration from PIAA, there is a potential employment relationship

---

determined with notable alacrity that the benefits were not remuneration. *Haavistola,* 839 F.Supp. 372 (D.Md.1994).

**11.** It may be instructive to compare an official's relationship with PIAA to a student athlete's relationship with PIAA. PIAA's reason for existence depends upon contests at which both athletes and officials perform necessary tasks. No federal court has defied common sense by holding student athletes to be Title VII employees of their schools or an athletic association. See *Graves v. WPRA,* 907 F.2d at 73 (rodeo association's rules and regulations control nonemployee members "in the same manner [that] a university exercises control over its [nonemployee] students—and ap-

plication deadlines and other requirements constitute 'control' over merely potential students"); see also *Cohen v. Brown Univ.,* 101 F.3d 155, 176 (1st Cir.1996) (distinguishing purposes of Title VII and Title IX); *Marshall v. Regis Educ. Corp.,* 666 F.2d 1324, 1328 (10th Cir.1981) (student athletes not employees under FLSA); *O'Halloran v. University of Wash.,* 679 F.Supp. 997, 1003 (W.D.Wash.1988) (distinguishing NCAA student athletes from employees). While there are many significant differences, the clear and relevant similarity is that during the regular season, PIAA comprehensively regulates both students and officials, and compensates neither.

to be determined under the principles of common-law agency expressed in *Darden.*

■ While no single factor is decisive, the hiring party's right to control the manner and means by which the work is accomplished is generally considered to be the most important factor of the *Darden* test. *Frankel v. Bally, Inc.,* 987 F.2d 86, 90 (2d Cir.1993); *Lattanzio v. Security Nat'l Bank,* 825 F.Supp. 86, 89 (E.D.Pa.1993). Nonetheless, as the Third Circuit has noted with respect to basketball officials:

> Officiating ill fits the usual distinction between independent contractors and employees. Emphasis on whether the [hiring party] supervises only the result of the official's job, versus how that result is achieved, makes little sense when dealing with a specialized skill: here, the "job" is "how it gets done."

*Collegiate Basketball Officials Ass'n v. NLRB,* 836 F.2d 143, 149 (3d Cir.1987). As plaintiff correctly points out, making judgment calls within the scope of the game is not a mark of an official's control of the manner and means of performing the job, but is simply the intrinsic nature of the job she is hired to do. See *id.* at 148–49. As in cases concerning physicians and other professionals, the exercise of independent judgment is an integral part of a sports official's job, and will not weigh heavily against a determination of employment status. See, *e.g., Cilecek,* 115 F.3d at 260 (finding debate about control over medical judgment to be nonproductive, and relying instead on "control involved in deciding when a doctor performs his services, the number of hours he performs them, and the administrative details incident to his professional services"); see also *Weber v. Commissioner,* 60 F.3d 1104, 1111 (4th Cir.1995) (in tax context, professional services generally require lower threshold level of control to find employee status).

PIAA exercises some control over the manner and means by which plaintiff officiates by establishing and adopting rules for each sport (PIAA By–Laws art. 17), determining official interpretations of those rules (Athletic Officials' Manual § I C 2), and training officials in those rules and interpretations. (*Id.*) The Delco Chapter at one time had an Evaluation Committee to evaluate the judgment and game performance of officials. (Scanlan Dep. at 19–22; Faulkner Dep. at 40–47.) Plaintiff's evidence indicates that PIAA exercises control over officials in other ways, and does not simply serve officials as a registry that maintains a list of the names of persons who pass an officiating test. Instead, PIAA possesses indicia of control that include the right to suspend an official's registration or put an official on probation who fails to follow a comprehensive set of regulations regarding the official's professional conduct, or simply "[w]ho fails to cooperate with P.I.A.A." (PIAA By–Laws art. 14, §§ 6–7.) Each official is required, upon PIAA's request, "to submit a written report of his official conduct in any game" to PIAA. (PIAA Chapter Const. art. 14.) PIAA requires that anyone officiating at a member school must use a PIAA official contract form. (PIAA By–Laws art. 14, § 3; PIAA Officials' Manual § I C 6.) That contract expressly subjects the parties "to all applicable provisions" of the PIAA's Constitution and By–Laws. (Fromson Decl. Ex. 7–9.)

Plaintiff disputes the significance of PIAA's evidence that an official's job involves specialized skill and training. But see *Collegiate Basketball Officials Ass'n,* 836 F.2d at 149 (basketball officiating is "specialized skill"). Delco Chapter is responsible for training and evaluating basketball officials. (Cashman Dep. at 75–78.) PIAA members are required to contract only with PIAA-registered officials, who have been tested by PIAA. (Wisniewski Dep. at 23; PIAA Officials' Manual § I B.) Plaintiff denies that PIAA's required examination is a "skills test."

The source of the instrumentalities and tools includes PIAA. Plaintiff owns her own whistle and her uniform, consisting of striped shirt, PIAA patch, black pants, socks, and shoes. (Kemether Dep. at 145.) One PIAA patch is provided free of charge to each official by PIAA. (Athletic Officials' Manual § I E 1.) PIAA also offers uniforms and other supplies for sale to officials. (Fromson Decl. Opp. Summ. J. Ex. 17.)

The location of the work is specified by PIAA. The Executive Director of PIAA "shall have the authority/responsibility for determining all game sites for P.I.A.A. playoffs, tournaments and/or championship events." (PIAA Rules & Regulations at 5.)

The duration of the relationship between the parties may be viewed as either long-term or short-term. Each selected official has an ongoing relationship for at least several years with PIAA as a registered official receiving regular season game assignments. (Fromson Decl. Ex. 17.) However, the assignment to officiate post-season games may involve only the duration of a single game, or may involve several weeks of games starting with district qualifiers and concluding with statewide championships. (Fromson Decl. Ex. 19.)

There is no evidence to suggest that PIAA has the right to assign additional games or other projects to an official without the official's consent. Nothing suggests that an official could be assigned any project other than what she contracted with PIAA to do under the PIAA playoff contract. (Fromson Decl. Ex. 10.)

An official has a high degree of discretion over when to work. When selected to officiate playoffs, the official may block out dates on the calendar when she is not available. (*Id.*) An official is given a means to decline assignments due to "an unexpected change in your schedule or an illness or injury." (*Id.*) Neither plaintiff nor PIAA has offered evidence indicating that either party may change the length of a game, which determines how long an official works.

An official has no role in hiring and paying assistants. Where there are two officials at a game, one is the referee, and the other is the umpire; the referee is the person in charge. (Kemether Dep. at 60.) Generally, the assignor decides who is assigned to which position, but the officials settle it between themselves if the assignor fails to specify. (*Id.* at 62.) Nothing suggests that plaintiff has any role in hiring or paying a second official, or choosing her own substitute if she misses or gives back a game.

The work involved is part of the regular business of the hiring party, as memorialized in its official Rules and Regulations. PIAA assumes general control over events leading to and including PIAA championships. (PIAA Rules and Regulations at 1, 5.) PIAA's district committees select all officials for district events, and PIAA's Executive Director or his appointed representative assigns all officials for events following district competition. (*Id.* at 5.)

PIAA engages in business by collecting revenues from the sale of tickets at post-season games, in addition to dues. (Fromson Decl. Ex. 30 at 5–6.) Among its other activities, PIAA sells products in interstate commerce to its registered officials. (Fromson Decl. Opp. Summ. J. Ex. 17, 18.)

PIAA provides an employee benefit by providing insurance to every registered official. (Lombardi Dep. at 64; Kemether Dep. at 151.) PIAA insures officials for up to one million dollars of liability while working games for PIAA member schools. (Watkins Dep. at 68–69; Wisniewski Dep. at 25.) There is no evidence of any other common employee benefits, such as paid vacation, health insurance, or a retirement plan.

No evidence was presented regarding the method of payment during playoffs. During the regular season, officials were paid by PIAA member schools and income taxes were not withheld from officials' compensation (Kemether Dep. at 148), and plaintiff received no W–2 form. (*Id.* at 150.) However, there is no evidence indicating whether the tax treatment of a post-season official is consistent with that described for the regular season.

Based on the totality of the circumstances, the *Darden* factors do not conclusively support a finding that an official working post-season games is not an employee of PIAA. Therefore, PIAA's motion for summary judgment on Title VII claims regarding PIAA's post-season employment decisions will be denied.

## C. PIAA's Control of Kemether's Employment by Third Parties

■ Whether or not plaintiff was an employee of PIAA, plaintiff may have been an

employee of the Del Val league or of a member school where she officiated.[12] Where the defendant is not the plaintiff's employer, Title VII provides liability in some circumstances against an employer that commits a discriminatory act that interferes with a plaintiff's employment relationships with third parties. Plaintiff argues that PIAA may be liable under 42 U.S.C. § 2000e–2(a)(1) by discriminatorily interfering with her access to employment opportunities, or under § 2000e–2(b) as an employment agency.[13]

### 1. *PIAA's Interference with Plaintiff's Employment During the Regular Season*

 It is an unlawful employment practice under 42 U.S.C. § 2000e–2(a)(1) for an employer

> to fail or refuse to hire or to discharge any individual, *or otherwise to discriminate against any individual* with respect to his compensation, terms, conditions, or privileges of employment . . .

42 U.S.C. § 2000e–2(a)(1) (emphasis added). The phrase "otherwise to discriminate against any individual" defines unlawful employment practices so broadly that in some cases, courts have not required any showing of an employment relationship between a plaintiff and defendant. See *Christopher v. Stouder Memorial Hosp.*, 936 F.2d 870, 874–76 (6th Cir.1991) (defendant denied privileges to private-duty scrub nurse); *Sibley*, 488 F.2d at 1342 (same); *Pelech v. Klaff–Joss, LP*, 815 F.Supp. 260, 262 (N.D.Ill.1993); *Burkey*, 513 F.Supp. at 1097 (citing *Sibley*, 488 F.2d at 1341–42); *Puntolillo v. New Hampshire Racing Commission*, 375 F.Supp. 1089, 1091–92 (D.N.H.1974). Based on this line of cases descended from *Sibley*,

and because 42 U.S.C. § 2000e–2(a)(1) broadly prohibits employment discrimination against "any individual" rather than any employee, I conclude that a Title VII defendant need not be the plaintiff's employer to interfere impermissibly with plaintiff's employment opportunities. Under § 2000e–2(a)(1), defendant's interference with plaintiff's outside employment relationships may be an independent basis for Title VII liability, where the defendant controls access to employment opportunities with third parties.

Even though PIAA need not be Kemether's employer in fact, a defendant still must be *"an* employer" as defined in the statute to be subject to coverage under § 2000e–2(a) in the first instance. The definition of "employer," for purposes of inclusion within the scope of Title VII, is found in 42 U.S.C. § 2000e(b). That subsection requires the employer to have at least fifteen employees, for at least twenty calendar weeks. As I will discuss in section D, *infra*, the resulting jurisdictional question of whether defendant PIAA is even an "employer" within the meaning of Title VII has not been resolved.

 Where the defendant is not plaintiff's employer in fact, it is the third-party relationship that must meet the common-law tests of an employment relationship under *Darden*. The Fifth Circuit notes:

> Application of a different standard in third-party situations could result in permitting recovery to an independent contractor where the discriminatory practices of the defendant interfere with the plaintiff's working relationship with another party, but denying recovery where the plaintiff's working relationship is with the defendant. The clear language of Title VII, as well as the need for consistency, dictates application of one standard for

---

**12.** A finding that a basketball official is an employee of a league or school would in no way preclude a finding that the official is also an employee of PIAA, since two employers may each be held liable under Title VII "when two entities exercise significant control over the same employees." *Graves v. Lowery*, 117 F.3d at 727.

**13.** Under either of these theories, PIAA cannot be held liable with respect to post-season games. Even assuming that a basketball official is an employee rather than an independent contractor,

an official hired for the playoffs or championships would be PIAA's *own* employee. *Sibley* stands for the proposition that Title VII prohibits a defendant's interference "with an individual's employment opportunities with another employer," not with the defendant itself. *Sibley*, 488 F.2d at 1341. And an employer cannot logically be held liable as an employment agency for the act of referring an employee to itself. See *Jones v. Southeast Alabama Baseball Umpires Ass'n*, 864 F.Supp. 1135, 1138 (M.D.Ala.1994).

determining employee status, regardless of whether the scrutinized work relationship is with the defendant or another party. *Diggs v. Harris Hospital–Methodist, Inc.,* 847 F.2d 270, 274 (5th Cir.1988); *Samuels v. Rayford,* No. 91–0365, 1995 WL 376939, at *7 (D.D.C. Apr.10, 1995); *Beverley v. Douglas,* 591 F.Supp. 1321, 1327 (S.D.N.Y.1984) (granting summary judgment to hospital because physician was not employee of her patients). Even the *Sibley* court went no further than to state that Title VII prohibits a defendant from "discriminatorily interfering with an individual's employment opportunities with *another employer.*" *Sibley,* 488 F.2d at 1341 (emphasis added); see *Samuels,* 1995 WL 376939, at *6; 2 BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 1286 n. 62 (3d ed. 1996) (suggesting that *Sibley* court implicitly treated patient as "joint employer" for jurisdictional purposes).

There are disputed material facts as to whether plaintiff's relationships with the Del Val league or its member schools were employment relationships within the meaning of Title VII. As an unincorporated association of schools, the Del Val league and its member schools stand in a relationship of mutual agency with one another, and they will be considered together for purposes of establishing whether an employment relationship existed.[14] The applicable test is that of *Darden,* 503 U.S. 318, 112 S.Ct. 1344. While the undisputed evidence of record might be sufficient to establish whether a basketball official is an employee of the league or the school that compensates her, I will defer consideration of this question to allow further development of the factual record at trial.

Because of these and other disputed facts, I will deny defendant's summary judgment motion as to this issue.

2. *PIAA's Coverage Under Title VII as an Employment Agency*

■ Title VII prohibits discriminatory employment practices by employment agencies, as follows:

> It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(b). For Title VII purposes, an employment agency is defined as "any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person." 42 U.S.C. § 2000e(c).

For jurisdictional purposes, the definition of "employment agency" requires no minimum number of employees or weeks to trigger coverage of a defendant under Title VII. However, "the definition does require that, in order to be an 'employment agency,' the entity must regularly do business with an 'employer,' and the term 'employer' as used in the definition of 'employment agency' is limited to those employers that fall within the definition of 'employer'." *Jones v. Southeast Alabama Baseball Umpires Ass'n,* 864 F.Supp. 1135, 1138 (M.D.Ala.1994); accord

---

**14.** It is undisputed that Del Val is an unincorporated association of public and private schools. (Williams Dep. at 7–8.) Under Pennsylvania law regarding unincorporated associations, each member that voluntarily assumes a participating role is subject to "the legal principle that where persons join in the prosecution of a common enterprise there is thereby created a mutual relationship of agency among them." *Selected Risks,* 552 A.2d at 1385 (quoting *DeVillars v. Hessler,* 363 Pa. 498, 70 A.2d 333, 335 (1950)). I conclude that there is a mutual relationship of agency among the member schools of Del Val for the purposes of their "common enterprise," *id.,* which are identified by Del Val in its constitu-

tion: "The purpose of the association shall be to sponsor, control and regulate interscholastic athletic activities among the member schools ..." (Del Val Const. art. II, § 1, Fromson Decl. Ex. 5). To the extent that each member school sponsors, controls, or regulates interscholastic athletic activities by its relationships with assignors and officials, the Del Val league and its member schools stand in a position of mutual agency. They bear responsibility as mutual agents for all such activities, including those undertaken by an individual member school and authorized or ratified by Del Val. See *Wortex Mills v. Textile Workers Union of America,* 380 Pa. 3, 109 A.2d 815, 822 (1954).

*Shrock v. Altru Nurses Registry*, 810 F.2d 658, 661 (7th Cir.1987).

It is undisputed that an assignor procures PIAA-registered officials for work at PIAA member schools during the regular season. It is probably beyond dispute, though not yet established, that at least one of these schools falls within Title VII's jurisdictional definition of an "employer" in § 2000e(b).

Because the assignor is considered PIAA's servant or subservant for purposes of its motion for summary judgment, and the assignor performs the actual "matchmaking" task of procuring officials for schools, PIAA may be held liable if an assignor engaged in unlawful discriminatory practices. Although a person who procures independent contractors is not considered an employment agency under 42 U.S.C. § 2000e(c), PIAA may be held liable as an employment agency if the assignors procure employees for others to hire. Disputed material facts remain as to whether a basketball official is the employee of a hiring school or a hiring league of schools. These disputes preclude summary judgment for PIAA.

### D. Jurisdictional Issues Under Title VII

There is no factual dispute regarding the plaintiff's fulfillment of the procedural prerequisites for a Title VII action, such as the timely filing of a charge before the EEOC. However, as a threshold matter, a court considering a Title VII claim must determine whether the defendant meets the statutory requirements for coverage as an employer. The record does not suffice to clearly establish that jurisdiction exists over PIAA as a Title VII employer. Because defendant has not asserted this deficiency as a ground for judgment in its favor, I suspect that defendant is an employer under the statutory definition, and I will allow the parties an opportunity to supplement the record.

For purposes of Title VII, an employer is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). This requirement is jurisdictional in nature. *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1359 (11th Cir.1994); *Armbruster v. Quinn*, 711 F.2d 1332, 1335 (6th Cir.1983); *Dumas v. Town of Mt. Vernon*, 612 F.2d 974, 979–80 (5th Cir.1980). This requirement limits the definition of an "employer" so that Title VII covers only employers large enough to meet that standard. The definition of "employment agency" has no parallel limitation. See 42 U.S.C. § 2000e(c).

It appears that the numerical threshold of fifteen employees may not be met unless officials are counted as PIAA's employees. An officer of PIAA has stated that only nine people work for PIAA, all of them full-time. (Lombardi Dep. at 19.) Plaintiff has not disputed the number of employees who are not officials, but has asserted that PIAA "employs over 12,000 officials." (Pl.'s Mem. Summ. J. at 21 n. 16.) The jurisdictional inquiry, therefore, must take into account whether officials are employees, and if so, for how many weeks they are employed.

In *Walters*, the Supreme Court established that an "employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll." 117 S.Ct. at 663. Liability, however, is not restricted only to employers who have fifteen or more employees on their payroll. Rather, the Court held that "the ultimate touchstone under § 2000e(b) is whether an employer has employment relationships" with the requisite number of individuals, as determined "under traditional principles of agency law." *Id.* at 666 (citing *Darden*, 503 U.S. at 323–24, 112 S.Ct. at 1348–49).

Looking at the evidence in the light most favorable to the plaintiff, and construing employment broadly for Title VII jurisdictional purposes, I apply traditional principles of agency law as elaborated in *Darden* and clarified in *Walters* to conclude that a PIAA-registered official is not in an employment relationship with any relevant hiring party—PIAA, Delco Chapter, an assignor, the Del Val league, or a PIAA member school—outside of the regular season or the post-season of that official's sport.

The "payroll method" outlined by the Supreme Court in *Walters* accepts as natural that each employee, even if part-time or

hourly, has a starting date and a termination date, and "an employee who works irregular hours, perhaps only a few days a month, will be counted toward the 15–employee minimum for every week in the month." 117 S.Ct. at 665. Because there is no evidence of record at present that sports officials are carried on the payroll of any relevant hiring party at any time, I must turn to other factors to determine the time boundaries of an official's potential employment relationship.

It is undisputed that the sports officials in this case are paid on a per-game basis; therefore, an official who works no games cannot receive payment from a hiring party. (See Kemether Dep. at 145–46.) Plaintiff's uncontroverted evidence shows that interscholastic games are played only during a defined season which includes dates for playoff and championship games. (PIAA By–Laws art. XV.)

Under the circumstances of this case, there is no "right to control the manner and means by which the product is accomplished" at a time when there is no product to accomplish; i.e., when no games may be played or officiated in that official's sport. See *Darden*, 503 U.S. at 323, 112 S.Ct. at 1348; *Jensen v. Johnson County Youth Baseball League*, 838 F.Supp. 1437, 1442 (D.Kan.1993) (counting working umpires as employees for jurisdictional purposes, and "working days as those when the league is active"). Some indicia of control outside of that time period are evidenced by PIAA's ability to drop or suspend an official's registration, or place her on probation, for a wide variety of reasons. (PIAA By–Laws art. XIV; Athletic Officials' Manual § I C.) Nevertheless, there is no evidence that a PIAA-registered official who is officiating no games has any work product, work location, hours, payment, assistants, or tax treatment, from any relevant source. The common-law agency test of *Darden* cannot rationally support a finding of employment for such an individual. See *Darden*, 112 S.Ct. at 1348–49; *O'Connor*, 126 F.3d at 115.

In this case, because PIAA has acknowledged its general control over championship events, the employment inquiry necessarily involves a separate determination of employment during the regular season and employment during post-season playoffs and championships. I conclude that for those officials working PIAA-controlled playoff or championship games, the earliest possible starting date for such employment is that of the first playoff game or district qualifier under the control of PIAA or a PIAA district committee, and the latest possible termination date is the last day that officiating work is available, i.e., the last game of championship competition. For those officials working regular season games, the earliest possible starting date is that of the season's first legal scrimmage or game, and the latest possible termination date is the last game of regular season competition. Without deciding whether or not an employment relationship might exist between these dates, or with whom, I conclude as a matter of law that there is no employment relationship with any relevant hiring party outside of these dates.

I am satisfied that if plaintiff were defendant's employee during the regular season, the numerical and temporal requirements for jurisdiction would both be met. Plaintiff has offered evidence showing that the regular seasons of PIAA's various sports cover approximately 32 weeks of the year (see PIAA By–Laws at 19–21). There are approximately 1,300 PIAA member schools. (Fromson Decl. Ex. 30 at 3.) Defendant has not contested the inference that at least fifteen officials are officiating games each week of the regular season, under terms and conditions that are materially identical to those enjoyed by plaintiff. However, for the reasons discussed in part B(1), *supra*, officials cannot be counted among PIAA's employees based on their officiating work during the regular season.

It remains undetermined whether officials working during post-season competition are defendant's employees. If they are not employees, it may be that the requirement of fifteen employees cannot be satisfied. If they are employees, it nevertheless appears that the twenty-week temporal threshold might not be satisfied. Even assuming that at least fifteen employees were working for PIAA during every week of playoff and

championship events, I can only discern from plaintiff's evidence that during the 1996–97 season there were fifteen calendar weeks of post-season competition. (See Rules and Regulations at 7–29.) Plaintiff has not demonstrated that there were twenty weeks of post-season competition in any relevant year.

Because the remedial nature of Title VII counsels latitude, because PIAA has not asserted this possible jurisdictional deficiency as a ground for summary judgment in its favor, and because there may be a ready answer which is not apparent on the current record only be cause the issue was not previously raised, I will give the parties two weeks from the date of this order to submit briefs and additional evidence on this question, or to submit a joint stipulation as to facts affecting jurisdiction.[15]

## II. TITLE IX CLAIMS AGAINST PIAA

Defendant has moved for summary judgment on plaintiff's claims under Title IX of the Education Amendments of 1972, codified at 20 U.S.C. § 1681 *et seq.* Title IX "proscribes gender discrimination in education programs or facilities receiving federal financial assistance." *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 514, 530–40, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). Plaintiff claims that defendant has violated Title IX: (1) by adopting and enforcing gender-based assignment policies and practices, (2) by limiting, segregating, and classifying officials on the basis of sex, and (3) by retaliating against plaintiff for her challenge to such policies by subsequently refusing to assign her to officiate any games.

PIAA argues that Title IX does not apply because PIAA is not a recipient of federal financial assistance. This argument does not support a grant of summary judgment. An alternative ground for summary judgment, which neither of the parties has briefed,

would be the argument that Title VII preempts Title IX as to any employment discrimination claims that could have been brought under Title VII. Nevertheless, under the circumstances of this case, defendant's motion for summary judgment will be denied.

### A. PIAA Is a Recipient of Federal Funds

■ PIAA argues that it is exempt from Title IX because it is not a recipient of federal funds. (PIAA Mot. Summ. J. at 18–26.) Plaintiff asserts that PIAA is subject to Title IX as an assignee of a recipient, because "PIAA has been assigned the responsibility of operating the interscholastic athletic programs of member schools." (Pl.'s Mem. Opp. Summ. J. at 12–13.) Plaintiff also argues (*id.* at 13) that PIAA receives federal funds indirectly through the dues paid to it by schools receiving federal assistance, and that PIAA is a recipient because it "operates an education program or activity which receives or benefits from such assistance." 34 C.F.R. § 106.2(h).

PIAA "operates an education program" within the meaning of 34 C.F.R. § 106.2(h). Part of PIAA's purpose is "to organize, develop, and direct an interscholastic athletic program." (PIAA Const. art. 1, § 1.) An interscholastic athletic program is an educational program or activity within the statute. 34 C.F.R. § 106.41; see *Smith v. NCAA*, 139 F.3d 180, 187 & n. 5 (3d Cir. 1998). PIAA's programs are recognized as educational in nature by the Pennsylvania legislature, which has regulated PIAA under its education statutes. See 24 P.S. §§ 5–511(b.1), (b) (mandating that PIAA admit private schools "if otherwise qualified," and implicitly assuming that PIAA admits qualified public schools and that PIAA's "purposes and activities are appropriate to and related to the school program"). PIAA re-

---

**15.** For all calendar years relevant to this action, the parties are directed to address whether PIAA met the jurisdictional requirement of 15 employees and 20 weeks under each of the following scenarios: (1) officials are not counted as employees, and (2) officials hired by PIAA or its districts during playoffs and championships are counted as employees for every calendar week from the first district qualifier or playoff game to the last game of championships, in every sport. The parties are strongly encouraged to reach a stipulation as to each scenario for each year. Because this question is intended to limit the parties to presenting factual evidence, rather than arguing the application of agency principles to those facts at this time, any accompanying briefs will be limited to a maximum of ten pages.

ceives part of its funding from public schools, and the state courts have recognized PIAA as a state actor based in part upon its financial connection with the public school system. *Harrisburg School District v. PIAA,* 453 Pa. 495, 309 A.2d 353 (1973); *Commonwealth by Packel v. PIAA,* 18 Pa.Cmwlth. 45, 334 A.2d 839, 842 (1975).

Title IX encompasses indirect recipients of federal funds.[16] *Smith,* 139 F.3d at 187–88 (citing *Grove City College v. Bell,* 465 U.S. 555, 564, 104 S.Ct. 1211, 1216, 79 L.Ed.2d 516 (1984)). In *Horner v. Kentucky High School Athletic Ass'n,* the Sixth Circuit found that a state high school athletic association is subject to Title IX when it receives dues from its member schools and performs statutory duties with respect to interscholastic sports. 43 F.3d 265, 271–72 (6th Cir.1994). The Third Circuit recently held that the presence of statutory authority is not an essential factor, and that Title IX coverage extends to "a voluntary organization created by and comprised of the educational institutions which essentially acts as their surrogate with respect to athletic rules." *Smith,* 139 F.3d at 188.

PIAA's Constitution requires its member schools, upon applying for membership, to furnish a resolution of their governing school board stating "that in all matters pertaining to interscholastic athletic activities, the school shall be governed by the Constitution and By–Laws of the P.I.A.A." (PIAA Const. art. 3, § 2.) This constitutes evidence sufficient to support a finding that PIAA acts as an agent or surrogate of its member schools. PIAA is funded in part by dues from its member schools, most of which are public schools. (PIAA Const. art. 4; Cashman Dep. at 16.) This constitutes evidence sufficient to support a finding that PIAA is an indirect recipient of federal funds. Accordingly, I will deny PIAA's motion for summary judgment on plaintiff's Title IX claim.

## B. Title VII Preemption of Title IX for Employment Discrimination Claims

The Third Circuit has never decided an employment discrimination case brought under Title IX, and there is significant dispute among the courts as to whether a private employment discrimination claim may be brought under Title IX.

In *Lakoski v. James,* 66 F.3d 751 (5th Cir.1995), the Fifth Circuit announced a rule that Title VII provides the exclusive remedy for allegations of employment discrimination in federally funded institutions. *Id.* at 753. Many of the federal courts considering this issue have followed *Lakoski,* concluding that to read a private cause of action for employment discrimination into Title IX would disrupt the "carefully balanced remedial scheme for redressing" such grievances as mandated by Congress through Title VII. *Lakoski,* 66 F.3d at 754; see *Lowrey v. Texas A & M University System,* 117 F.3d 242 (5th Cir. 1997) (refining *Lakoski* in Title IX claim by college women's basketball coach); *Waid,* 91 F.3d at 862–63; *Burrell v. City Univ. of New York,* 995 F.Supp. 398, 409–10 (S.D.N.Y. 1998); *Cooper v. Gustavus Adolphus College,* 957 F.Supp. 191, 193 (D.Minn.1997); *Glickstein v. Neshaminy School District,* Civ. No. 96–6236, 1997 WL 660636 (E.D.Pa. Oct.22, 1997); *Howard v. Board of Educ. of Sycamore Community Unit School District,* 893 F.Supp. 808, 815 (N.D.Ill.1995).

However, other courts have reached the opposite conclusion, recognizing a cause of action under Title IX for employment discrimination against a federally funded education program. See *Ivan v. Kent State Univ.,* 1996 WL 422496, at *2 n. 10 (6th Cir. July 26, 1996) (per curiam) (unpublished disposition); *Preston v. Commonwealth of Virginia ex rel. New River Community College,* 31 F.3d 203, 205–06 (4th Cir.1994); *Bedard v. Roger Williams University,* 989 F.Supp. 94, 97 (D.R.I.1997); *Bowers v. Baylor Univ.,* 862 F.Supp. 142, 145 (W.D.Tex.1994); *Nelson v.*

---

**16.** Arguing that it is not a recipient of federal funds, PIAA offers in its support a letter decision from the Office of Civil Rights ("OCR"), the agency charged with implementation and enforcement responsibility for Title IX. (Def.'s Mot. Summ. J. Ex. E.) In this 1996 letter, OCR determined that PIAA was not a recipient of

federal assistance under § 504 of the Rehabilitation Act, which defines "recipient" in terms materially identical to those of Title IX. This court is not bound by that agency's legal conclusion, which was, at any rate, fatally undermined by the Third Circuit's subsequent decision in *Smith.* 139 F.3d at 187–88.

*Univ. of Maine Sys.*, 923 F.Supp. 275, 278–79 (D.Me.1996).

In a recent case of first impression among the district courts of this circuit, the Fifth Circuit's reasoning in *Lakoski* was adopted as persuasive. *Glickstein,* 1997 WL 660636 at *15. Judge Hutton ruled that "Congress did not intend that private plaintiffs be able to circumvent the remedial process of Title VII and its state analogs merely by framing a complaint in terms of Title IX. This can only be prevented by barring private employment discrimination claims under Title IX to the extent that the same claims could have been brought under Title VII." *Id.*

In response to the valid and important concerns expressed in *Glickstein,* I note that because this plaintiff went through the proper EEOC procedures, there was no attempt on her part "to circumvent the remedial process of Title VII." At least one of her Title VII claims will reach trial. Furthermore, the *Lakoski* preemption rule might bar plaintiff's claims of discrimination under Title IX, but only to the extent that those claims could have been brought under Title VII. Kemether's Title VII claims that will not reach trial, especially those that involve a relationship with PIAA other than employment, were dismissed on summary judgment precisely because they could *not* be brought under Title VII. I conclude specifically that plaintiff's claims of gender discrimination during the regular season did not involve "employment" as that term is defined for Title VII purposes, and may therefore be brought under Title IX. Defendant's motion for summary judgment will be denied as to plaintiff's Title IX claims of gender discrimination.

## III. FEDERAL CONSTITUTIONAL CLAIMS

As discussed above in my analysis of plaintiff's motion for partial summary judgment, controlling precedents in our Court of Appeals require plaintiff's Equal Protection claim to be dismissed because it is subsumed within her Title IX claim. *Williams,* 998 F.2d at 176; *Pfeiffer,* 917 F.2d at 789. I will therefore grant defendant's motion for summary judgment on plaintiff's Equal Protection claim.

I will not, however, extend the doctrine of *Williams* and *Pfeiffer* further than those controlling cases require. As the Third Circuit pointed out in *Pfeiffer,* the *Sea Clammers* doctrine relies on the justification that if "a state official is alleged to have violated a federal statute which provides its own comprehensive enforcement scheme, the requirements of that enforcement procedure may not be bypassed by bringing suit directly under § 1983." 917 F.2d at 789 (quoting *Sea Clammers,* 453 U.S. at 20, 101 S.Ct. at 2626). Again in *Williams,* the court relied on the fact that "constitutional claims under 42 U.S.C. § 1983 are precluded because they are based on a matter fully addressed by the comprehensive scheme in title IX." 998 F.2d at 176.

While both cases speak broadly in dicta of "constitutional claims," each of them deals with such claims only in the context of 42 U.S.C. § 1983. Plaintiff's claim under the First Amendment is brought independently of § 1983. The preclusion doctrine enunciated in *Sea Clammers* "pertains only to claims brought under § 1983 to enforce rights created by congressional statutes," and not "to rights which exist under the Constitution itself." *PBA Local No. 38 v. Woodbridge Police Dep't,* 832 F.Supp. 808, 825 (D.N.J. 1993) (citing *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 508, 110 S.Ct. 2510, 2516, 110 L.Ed.2d 455 (1990)). Because Title IX does not contains a comprehensive scheme for the enforcement of First Amendment rights, and because First Amendment rights arise not from a statutory source but from the Constitution itself, I will deny defendant's motion for summary judgment on plaintiff's First Amendment claim.

## IV. PENNSYLVANIA STATE LAW CLAIMS

Because I have not granted summary judgment as to all of plaintiff's federal claims, this court will retain supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367.

## CONCLUSION

I will grant summary judgment in favor of defendant on the Title VII claim against PIAA as plaintiff's employer during the regular season. However, the Title VII claim against PIAA as an employment agency survives summary judgment. Subject to a determination of jurisdiction, plaintiff's Title VII claim regarding post-season employment of officials and the claim regarding interference with access to employment will also reach trial.

Summary judgment will be denied as to plaintiff's Title IX claim, First Amendment claim, and state law claims. I will grant defendant's summary judgment motion as to the Equal Protection claim under 42 U.S.C. § 1983, because that constitutional claim is subsumed within plaintiff's Title IX claim.

### ORDER

AND NOW, this 6th day of August, 1998, upon consideration of the motions for summary judgment filed by both parties, and for the reasons set forth in the accompanying memorandum, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for partial summary judgment is DENIED.

2. Defendant's motion for summary judgment is:

 a. GRANTED as to plaintiff's Title VII claim against PIAA as her employer during the regular season, and DENIED as to plaintiff's other claims under Title VII,

 b. GRANTED as to plaintiff's Fourteenth Amendment claim, and

 c. DENIED in all other respects.

3. The parties are directed to submit additional evidence or a joint stipulation of facts relating to the court's jurisdiction over Title VII claims against PIAA as an employer,* within two weeks of the date of this order.

* See accompanying memorandum at 764–766 & n. 15.